## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THOMAHL COOK,                          :
                                       :
              Petitioner,              :      Civ. No. 05-3916 (KM)
                                       :
      v.                               :
                                       :
PATRICK NOGAN, et al.,                 :      **OPINION**
                                       :
              Respondents.             :
                                       :

### KEVIN MCNULTY, U.S.D.J.

## I.     INTRODUCTION

The petitioner, Thomahl Cook, is a state prisoner proceeding *pro se* with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2000, Mr. Cook was convicted by a jury of first-degree murder. He is currently serving a sixty-year sentence with a thirty-year period of parole ineligibility. He asserts that his confession to the murder was involuntary and that counsel rendered ineffective assistance, among other claims. For the following reasons, the amended habeas petition will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Fifteen-year-old Katrina Suhan was murdered sometime in the early morning hours of Saturday, February 14, 1998. She was seen last on that date at about 12:30 a.m., walking home from Roller Magic, a South Amboy roller-skating rink where she and her girlfriends frequently skated. A friend who had been with her, classmates driving by, and a security guard closing the rink, saw her walking alone on Stevens Avenue in South Amboy. Ordinarily it would have been at least a fifteen-minute walk from the rink to her home. At sometime between 12:30 and 1:00 a.m., a resident of Stevens Avenue heard a male and a female arguing outside his window. The male voice was saying "Come on. Let's go," and the

---

[1] The factual background is taken from the New Jersey Supreme Court's 2004 decision on Mr. Cook's direct appeal. *See State v. Cook*, 847 A.2d 530 (N.J. 2004).

female voice was saying, "No, I'm not going nowhere with you."
Shortly thereafter, the resident thought he heard a scream come
from across the street. Another neighbor on Stevens Avenue also
heard a girl screaming, "Leave me alone. Don't touch me. Help
me" at approximately 12:15 a.m. That resident testified that she
heard two male voices urging the girl to "shut up" and to "be
quiet."

Katrina's body was found on the afternoon of Sunday, February 15
in a rough wooded lot behind the Hill Lanes bowling alley located
in the neighboring town of Old Bridge. The bowling alley was
approximately three miles from where Katrina was last seen. She
had been brutally beaten. Her body was positioned face downward
and a jacket covered her head; her pants had been pulled below her
waist. Large pieces of concrete lay atop her hands and head and an
overturned red shopping cart was situated in front of, and partially
on, her body. A trail of blood led to the body and to several rocks
near her head. A forensic pathologist expressed the view that
Katrina died of blunt trauma injury to the head. There was injury
also to her left breast that was consistent with a bite mark; there
were no other physical signs of sexual assault.

Defendant, who was twenty-four years old at the time of the
murder, had been known to go to the roller rink in South Amboy
and had been observed interacting with Katrina while there. [FN 1]
Heather McKnight, who was defendant's girlfriend, Donna
Pascale, Heather's fellow tenant in Agape House (a home for
young females located in Somerville), and Robert Poquette, a
tenant at the Somerville boarding home in which defendant
resided, all testified that on the night Katrina was murdered
defendant was looking for transportation to the South Amboy
roller rink. According to Pascale, defendant told her that a friend
had agreed to drive him to the rink. McKnight testified that
defendant told her that he was going to the rink with a friend
named "Noal." Apparently, McKnight was not planning to be with
defendant that night as she intended to stay with her sister, who
lived out of town, from Friday afternoon to Sunday afternoon.

> [FN 1] A friend of Katrina's Heather Stonbely,
> testified to interactions that she had observed
> between defendant and Katrina several months
> before the murder when the two girls had been at
> the roller rink.

The record reveals certain information from third parties
concerning defendant's whereabouts during the evening of Friday,

February 13, 1998. At approximately 9:45 p.m. that night, defendant encountered fourteen-year-old T.S., and two of her friends, at the Bridgewater Commons Mall. T.S. testified that she spoke with defendant at the mall for twenty minutes to a half hour before all five departed, on foot. While walking to T.S.'s home, defendant commented to T.S. that she reminded him of "Kat," a shorthand reference that T.S. took to mean "Katrina." During the walk defendant also told her he was going to a skating rink in South Amboy to scare someone. T.S. recalled that she entered her home sometime between midnight and 12:30 a.m. that night, and defendant left on foot five or ten minutes before she entered the house. T.S.'s mother corroborated that her daughter arrived home at approximately midnight that evening.

Both McKnight and Pascale saw defendant on Sunday, February 15. Pascale observed that defendant had cuts on one of his hands and that his knuckles were swollen, and McKnight testified that defendant's right arm appeared to be injured. On Monday February 16, Pascale went to the Somerville police to report her suspicion that defendant was involved in the publicized murder of the girl from the roller rink.

At approximately 9:30 p.m. that evening, defendant was arrested on the basis of two outstanding municipal warrants. [FN 2] He was transported to police headquarters in Somerville for questioning about the Suhan murder. In reviewing the record concerning defendant's interrogation, we focus here on the evidence presented pre-trial at defendant's *Miranda* hearing. There are no video or audio tapes of defendant's custodial interrogations. The entire record consists of the reports of the investigating officers and their testimony at the *Miranda* hearing. [FN 3]

> [FN 2] Defendant was arrested on an outstanding municipal warrant issued by the Red Bank Borough Municipal Court on January 7, 1993, and another warrant issued by the Sayreville Municipal Court on October 8, 1997.

> [FN 3] Apparently, once each officer prepared his report he destroyed his notes from the interrogation sessions, a practice that is apparently common, but one that we disapprove of.

The first interrogation was conducted by Detective William Moscariotola of the Old Bridge Township Police Department and by Investigator John Maslak of the Middlesex County Prosecutor's

3

Office. The interrogation began at approximately 9:50 p.m. on February 16, after defendant was advised of his *Miranda* rights and acknowledged that he understood them. When the officers began questioning defendant concerning his whereabouts during the past weekend, the officers did not tell him that he was being questioned about the murder victim found in Old Bridge. In response to questioning, defendant told the officers that he had not been to the South Amboy roller rink since the Columbus Day weekend of the previous fall. He was then asked whether he had been to the Old Bridge bowling alley during the past weekend. He informed the officers that he had stopped there with McKnight in order for her to use a telephone. He was unclear in respect of who was driving. He told the two interrogating officers that while McKnight was using the phone he had gone into the wooded area behind the building to relieve himself. There he saw a "pile" that he said had a foul smell and contained "something red and that this red thing had a right angle." After approximately ninety minutes of questioning, defendant asked whether the interview had anything to do with the girl missing from the roller rink. The officers told him that it did, and they then confronted him with the fact that McKnight had been out of town for the weekend.

The interrogation continued and defendant became increasingly emotional, nervous, and halting in his responses. At one point, defendant began to cry and told Moscariotola that, "she freaked me out. I don't know what happened." A break was taken. When the interview resumed both officers were present in the room. Defendant, appearing to have collected himself, recanted his earlier statement, instead claiming that he had said, "it freaked me out." A short while later defendant was shown a picture of Katrina's body taken at the crime scene. According to both officers, defendant's comment, when shown the photo, was: "I didn't sexually abuse that girl." The officers terminated the interview at approximately three o'clock in the morning.

During the course of that initial interview defendant was offered a beverage and bathroom break after about two hours of questioning. Also, at approximately 2:15 a.m., after defendant had signed a consent form permitting the search of his room, a beverage was provided to him again and *Miranda* warnings were readministered. Although a tape recorder was available during the interview, the officers did not tape any portion of the interrogation. After that initial interrogation, defendant was transported to the Middlesex County Adult Correctional Facility in North Brunswick and held on the municipal warrants.

4

Defendant's second interrogation commenced at approximately 10:40 a.m. on Wednesday, February 18, at the detention facility in which he was being held. This interrogation was conducted by Maslak alone. Defendant was given fresh *Miranda* warnings and, then, during a two-hour interview, defendant recounted a version of his whereabouts that differed from that given in his first interview. As the questioning continued, he altered further the version he had just provided to Maslak. Essentially, defendant provided two conflicting but exculpatory statements placing himself far from the scene of the crime. At that point, defendant was asked and consented to have a polygraph test administered to him.

Investigator Angelini, a polygraph expert, was brought in. He conducted (what the motion court later considered to be) the third interrogation of defendant, which concluded at about 3:30 p.m. While alone with defendant, Angelini administered a pre-test polygraph and polygraph of defendant after defendant first was given fresh *Miranda* warnings and he signed consent forms for the test. Defendant's statements during this portion of the interrogation were not submitted for admission. This third interrogation is relevant only because the negative results of the polygraph were made known to defendant during the fourth and final interrogation.

The fourth interrogation started at about 3:30 p.m. Both Angelini and Maslak were present during this session in which defendant made his most incriminatory statements. They reported that defendant appeared cooperative and responsive at first. Twenty minutes into the interview, he was told that he had "failed" the polygraph test. According to Angelini, after defendant heard that, he became more pensive, withdrawn, and not as responsive as he had been during the polygraph. His responses to questions became extremely delayed. It was reported that he would take as long as five minutes before responding to a question, often putting his hand to his head as he appeared to think about how to answer. During this fourth session, which lasted until approximately 8:00 p.m., defendant gave another version of his whereabouts the evening of Katrina's murder. He stated that he went with a man named "Russ" in a gold colored van to the Old Bridge bowling alley vicinity. Later, he told the officers that "Russ" took him to South Amboy and they both took Katrina in the van to Old Bridge, and alternatively that he did not know how he got to South Amboy but he remembered being on Stevens Avenue and seeing Katrina. In one version, it was "Russ" who allegedly attacked Katrina. During the questioning, defendant became emotional and started crying, trembling, and moaning.

Ultimately, defendant told the officers that he killed Katrina. He told them that he approached Katrina when she was walking home from the rink. He stated that after meeting up with her on Stevens Avenue near the church on that street, he walked her to the field located behind the Old Bridge bowling alley where he made sexual advances toward her. When she spurned him, he became enraged and struck her in the face with his fist. According to the officers, defendant said, "She was scared. Her eyes kept looking at me. I didn't want to see her eyes. I didn't want her eyes to see me." Defendant struck her in the face repeatedly with a two-by-four board that he took from a nearby pile of debris. He then hit her head with a rock four or five times. Believing Katrina to be dead, defendant dragged her body deeper into the field.

The officers did not record electronically the interrogation sessions that took place on February 18. Each officer conceded at trial that a statement by an interviewee normally would be taped; however, due to defendant's emotional state, the disjointed nature of his responses to questions posed, and his repeated recanting or changing of his story, they believed it preferable to make a written report of the interrogation rather than to attempt an electronically taped statement. We note here that during the overall nine-hour period in which defendant was questioned on February 18, he was provided with lunch (which he ate), dinner (which he declined, preferring to have only a beverage), and beverage breaks and cigarettes. Moreover, although lengthy, the interrogation was conducted during regular daytime hours.

Defendant was charged under Middlesex County Indictment No. 98–11–01562 with purposeful or knowing murder, in violation of N.J.S.A. 2C:11–3a(1) and –3a(2). A *Miranda* hearing was conducted in which the State sought, over defendant's objection, the admission of defendant's inculpatory statements. After reviewing in summary fashion the details of each segment of defendant's interrogation, the court ruled the statements made during the first, second, and fourth interrogations to be admissible. As noted, the State was not seeking the admission of any statements made during the third (polygraph) portion of the interrogation. The motion court found that the required *Miranda* warnings had been provided, defendant had understood those warnings, and he had knowingly and intelligently waived his rights. The court also determined that defendant's statements had been made voluntarily. In the course of making its findings, the court noted defendant's high school education and that he had not been subjected to any physical or mental abuse. The court found it

> understandable and consistent with common sense that defendant
> became more emotional as his statements became more
> inculpatory.
>
> Defendant also moved *in limine* for permission to introduce
> evidence of the subsequent January 17, 1999, murder of Nancy
> Noga, which had occurred while defendant was incarcerated. Noga
> was close in age to Katrina. Noga's body was found near to where
> she worked, in a location approximately one mile from where
> Katrina's body was found. The court refused to admit the evidence,
> concluding that it was too speculative notwithstanding some
> similarities between the murders.
>
> Defendant was found guilty of purposeful and knowing murder
> following an eight-day jury trial.

*Cook*, 847 A.2d 530, 534–37.

The New Jersey Superior Court, Appellate Division, affirmed Mr. Cook's conviction, but

remanded for resentencing.[2] The New Jersey Supreme Court granted Mr. Cook's certification

petition and ultimately affirmed the judgment of the Appellate Division. *See Cook*, 847 A.2d

530.

Mr. Cook filed a petition for post-conviction relief ("PCR"). That PCR petition primarily

raised claims of ineffective assistance of counsel. The PCR petition was denied without an

evidentiary hearing on September 10, 2010, for the reasons earlier expressed by the state court

on the record on August 30, 2010. (*See* Dkt. Nos. 28-10 & 31-7) Mr. Cook then appealed that

denial to the Appellate Division, which affirmed on December 7, 2012. (*See* Dkt. No. 29-3) The

New Jersey Supreme Court denied certification on June 7, 2013. (*See* Dkt. No. 29-7)

As Mr. Cook's PCR proceedings were working their way through the state courts, in

August 2005, he filed a federal habeas petition in this Court through Ms. Marcia Blum, Esq., of

the state's Public Defender Office. The matter was initially assigned to District Judge Faith S.

---

[2] On remand, Mr. Cook received a sentence of sixty years with a thirty-year period of parole ineligibility.

Hochberg. On December 8, 2005, Judge Hochberg stayed these federal habeas proceedings pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). Mr. Cook was advised to return to this Court by filing a motion to reopen within thirty days after completion of his PCR proceedings. (*See* Dkt. No. 9)

In October 2013, Mr. Cook sought to reopen this action by filing a *pro se* letter. (*See* Dkt. No. 10) However, this case was not reopened at that time. Thereafter, on February 18, 2015, this Court received Mr. Cook's *pro se* motion to reopen this case and motion for leave to file an amended petition. (*See* Dkt. No. 11) On March 17, 2015, Chief Judge Simandle reassigned this case to me, Judge Hochberg having retired in the interim. (*See* Dkt. No. 12)

On March 31, 2015, this Court issued a memorandum and order. (*See* Dkt. No. 13) The Order noted that although Ms. Blum was still Mr. Cook's counsel of record, he had filed his motion to reopen *pro se*. Ms. Blum was ordered to either:  (a) file a motion to reopen on Mr. Cook's behalf; (b) state why such a motion would not be appropriate; or (c) file a motion to withdraw as Mr. Cook's counsel.

Thereafter, on April 20, 2015, Ms. Blum filed a motion to withdraw. (*See* Dkt. No. 15) On April 29, 2015, the motion to withdraw was granted. (*See* Dkt. No. 16) I granted petitioner's motion to amend his habeas petition and ordered respondents to file a response to the amended habeas petition. (*See id.*) The amended habeas petition raises the following claims:

1.  Mr. Cook's confession should have been suppressed because it was involuntary and was obtained only after his will was overborne ("Claim I").

2.  Mr. Cook's statements should be suppressed because he did not knowingly, intelligently and voluntarily waive his right to remain silent at the interrogation sessions ("Claim II").

3. The confession should have been excluded because it was uncorroborated and the motion for a judgment of acquittal should have been granted because without the confession, there was insufficient evidence to sustain the murder conviction against Mr. Cook ("Claim III").

4. The trial court violated Mr. Cook's right to due process and right to present a defense when it prohibited him from presenting evidence that someone else may have committed the offense ("Claim IV").

5. Ineffective assistance of counsel for failing to effectively pursue an alibi defense ("Claim V").

6. Ineffective assistance of counsel for failing to present testimony that supported a third-party guilty defense ("Claim VI").

7. Ineffective assistance of counsel for failing to object to Heather Stonbely's testimony arising out of late discovery or by failing to request a continuance or present evidence to contradict her testimony ("Claim VII").

8. Ineffective assistance of counsel for failing to request that the trial court instruct the jury regarding corroboration of the confession to police ("Claim VIII").

9. Ineffective assistance of counsel by presenting a defense through cross-examination as it was detrimental ("Claim IX").

10. The accumulation of errors violated Mr. Cook's right to due process and/or effective assistance ("Claim X").

Respondents ultimately filed a response in opposition to the amended habeas petition on September 9, 2015. (*See* Dkt. Nos. 25-31) Mr. Cook did not file a reply in support of his habeas petition.

### III.   HABEAS CORPUS – LEGAL STANDARD

A writ of habeas corpus for a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws or treaties of the United States. *See Engle v. Isaac,* 456 U.S. 107, 119 (1982); *see also Mason v. Myers,* 208 F.3d 414, 415 n.1 (3d Cir.2000) (citing 28 U.S.C. § 2254). Because Mr. Cook filed his petition for writ of habeas corpus after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy,* 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade,* 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). And, having identified the governing principle of federal law, a habeas court must also ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor,* 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established

federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" one to meet; it is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011). Review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard,* 539 F.3d 256, 289–90 (3d Cir.2008). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991); *see also Hittman v. Chatman*, 135 S. Ct. 2126, 2128 (2015) (Ginsburg, J., concurring in denial of certiorari) ("There is no reason not to 'look through' such adjudications, as well, to determine the particular reasons why the state court rejected the claim on the merits."); *Blystone v. Horn,* 664 F.3d 397, 417 n.15 (3d Cir. 2011). AEDPA deference remains appropriate, even as to summary state court rulings; "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or statelaw procedural principles to the contrary." *Harrington v. Richter,* 562 U.S. 86, 99 (2011) (citing *Harris v. Reed,* 489 U.S. 255, 265 (1989)).

## IV.   DISCUSSION

### A.  Claim I – Voluntariness of confession

In Claim I, Mr. Cook asserts that his confession should have been suppressed because it was not voluntary. The last reasoned decision on this claim was on direct appeal to the New Jersey Supreme Court, which analyzed the claim as follows:

> [T]he State must demonstrate the voluntariness of a confession beyond a reasonable doubt. *State v. Galloway,* 133 N.J. 631, 654, 628 A.2d 735 (1993). An involuntary confession can result from physical or psychological coercion. *Ibid.* However, unlike the use of physical coercion, use of psychologically oriented interrogation techniques is not inherently coercive. *Ibid.* Confessions are not voluntary if derived from "very substantial" psychological pressures that overbear the suspect's will. *Id.* at 656, 628 A.2d 735. In determining whether a defendant's will was overborne, the totality of the circumstances must be examined, "including both the characteristics of the defendant and the nature of the interrogation." *Id.* at 654, 628 A.2d 735. Relevant factors include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." *Ibid.* (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S. Ct. 2041, 2047–48, 36 L. Ed. 2d 854, 862 (1973); *State v. Miller,* 76 N.J. 392, 402, 388 A.2d 218 (1978)).
>
> At the suppression hearing in this case, the trial court considered many of those factors:
>
> > It is clear from the testimony that defendant went through a serious emotional experience in giving this statement. With intermittent breaks, he was questioned by two different officers over a nine-hour period. At no time did he request to stop or ask for a lawyer. He was given drinks and cigarettes. [He] was apparently given bathroom breaks and there is no evidence that promises were made to him.
> > ...
> > The defendant was a high school graduate. There was no indication that he was unwilling to speak, nor that he was excessively tired. The interrogation,

> although lengthy, it was all during the general work
> day, and there was no indication that he was sleep
> deprived, or that he was in any way physically or
> mentally abused. He was given breaks, had one
> meal and refused another. Although he was
> emotionally distraught, his will was not overborne.
> The emotional distress seems more related to the
> horrible things he was admitting than to anything
> else.

> The trial court applied the correct standards and amply explained
> its application of those standards when evaluating defendant's
> condition while he was interrogated. We agree with the trial court's
> conclusion, affirmed by the Appellate Division, that defendant has
> not shown that he was subject to substantial psychological pressure
> warranting suppression of his statements. We see no reason to add
> to the evaluation of the trial court, and therefore reject the
> argument advanced by defendant.

*Cook*, 847 A.2d 530, 547–48.

"Only confessions that are voluntary may be admitted into evidence at a criminal trial[.]"

*United States v. Andrews*, 231 F. App'x 174, 176 (3d Cir. 2007) (citing *United States v. Swint*, 15

F.3d 286, 288-89 (3d Cir. 1994)). "A confession is voluntary when it is the "'product of an

essentially free and unconstrained choice by its maker,' that it was 'the product of a rational

intellect and a free will,' and that the appellant's will was not overborne.'" *Id.* (quoting *Swint*, 15

F.3d at 289 (citing *United States ex re. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975)).

In determining the voluntariness of a confession, "the court must consider the effect that the

totality of the circumstances had upon the will of the defendant." *Miller v. Fenton*, 796 F.2d 598,

604 (3d Cir. 1986) (citations omitted); *see also Andrews*, 231 F. App'x at 176. A court must

examine various factors in making this determination, such as:

> the youth of the accused; his lack of education or his low
> intelligence; the lack of any advice to the accused of his
> constitutional rights; the length of detention; the repeated and
> prolonged nature of questioning; and the use of physical
> punishment such as the deprivation of food or sleep.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citations omitted).

The New Jersey Supreme Court appropriately cited and applied the applicable legal standards in deciding this claim. Its decision that Mr. Cook's will was not overborne during the course of the interrogations was grounded in the factual record as illustrated in the *Miranda* hearing transcript (*see* Dkt. No. 29-8), and subsequent decision by the trial judge (*see* Dkt. No. 29-9). Mr. Cook was questioned for approximately five hours during the late evening and early morning hours of February 16th-17th, and then for nine or ten hours on February 18th. Mr. Cook made incriminating statements during the February 16th-17th interrogation and confessed to the murder during the February 18th interrogation. While each interrogation lasted for hours, the length of each interrogation is but one factor that a court needs to examine when determining whether a petitioner's will has been overborne.

The New Jersey Supreme Court properly examined the totality of the circumstances. Those circumstances included the fact that Mr. Cook had a high school education; was not sleep deprived; was given a meal, drinks and cigarettes; was permitted to use the bathroom; was not given any promises or subjected to psychological manipulation; and never requested that questioning should cease. Thus, the New Jersey Supreme Court's decision that Mr. Cook's will was not overborne was based in the facts of record. It was not based on an unreasonable determination of the facts. *See, e.g., Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) ("Perez's interrogation as demonstrated by the pretrial record did not undermine Cunningham's free will. While it is true that the interrogation lasted for eight hours, Perez did not refuse to give Cunningham a break for food or water. Perez also never yelled and failed to use violence or the threat of violence."); *United States v. Lehamn*, 468 F.2d 93, 101 (7th Cir.

1972) (vigorous interrogation with only slight disruptions for eight hours does not mean statements were coereced).

Accordingly, Mr. Cook is not entitled to federal habeas relief on Claim I.

B. <u>Claim II – Waiver of right to remain silent</u>

In Claim II, Mr. Cook makes the distinct claim that his statements to police should have been suppressed because the State did not establish beyond a reasonable doubt that he voluntarily waived his right to remain silent. He does not deny that he received *Miranda* warnings, but does deny that he waived his rights.

Mr. Cook raised this issue on direct appeal. The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate Division, which expressly rejected it as "factually unsupported." (*See* Dkt. No. 27-1 at p.12)

The denial of this claim by the state courts was not an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the United States Supreme Court formulated the now-familiar warning that must be given to a suspect before the suspect can be subjected to custodial interrogation:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Post-warning, there must be a waiver if subsequent statements are to be admitted:

> After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him

*Id.*

A valid waiver has two distinct dimensions; it must be both voluntary and informed:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.,* 442 U.S. 707, 725 (1979). See also *North Carolina v. Butler,* 441 U.S. 369, 374–75 (1979).

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). A *Miranda* waiver need not be express; an implied waiver, if demonstrated, is sufficient. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). A waiver may be implied "through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Nevertheless,

> [i]f the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" of *Miranda* rights. *Miranda, supra,* at 475, 86 S. Ct. 1602. The prosecution must make the additional showing that the accused understood these rights . . . . Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

*Berghuis*, 560 U.S. at 384. "In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at 388–89.

Mr. Cook was orally advised of his *Miranda* rights at the first interrogation session on February 16th. (*See* Dkt. No. 29-8 at p.9) Mr. Cook stated that he understood those rights. (*See id.*) Thereafter, Mr. Cook waived his right to remain silent by making voluntary statements to the

police. Mr. Cook did not indicate to the police during this interrogation that he wanted to stop. (*See id.* at p.13-14)

Mr. Cook was again advised of his *Miranda* rights at the beginning of the February 18th interrogation. He signed the *Miranda* card and indicated that he understood his rights. (*See id.* at p.50) Thereafter, Mr. Cook again waived his right to remain silent by making voluntary statements to the police. Mr. Cook did not ask the police to stop the interrogation. (*See id.* at p.80)

Accordingly, Mr. Cook is not entitled to federal habeas relief on Claim II. There was ample support in the record for the conclusion that he waived his *Miranda* rights. The state court finding that this claim lacked a factual basis was not unreasonable.

## C. Claim III – Uncorroborated confession

In Claim III, Mr. Cook asserts that his confession should have been excluded because it was uncorroborated. It follows, he argues, that the court should have granted his judgment of acquittal because without the confession, the evidence was insufficient. The last reasoned decision on this claim was on direct appeal to the New Jersey Supreme Court, which analyzed the claim as follows:

> Defendant also contends that his confession should have been excluded because it is uncorroborated, and that his motion for judgment of acquittal should have been granted. When the State seeks to introduce a confession into evidence, "some corroboration is required as a matter of law but if there is such corroboration, [it is for] the jury [to] resolve 'arguments and speculation' about its weight and sufficiency." *State v. Di Frisco*, 118 N.J. 253, 271–72, 571 A.2d 914 (1990), *cert. denied, DiFrisco v. New Jersey,* 537 U.S. 1220, 123 S. Ct. 1323, 154 L. Ed. 2d 1076. Commentators have noted that "New Jersey's requirements are narrow with respect to the quantum of evidence required to establish corroboration" of a confession offered by the State for the truth of its contents. 7 J. Wigmore, *Wigmore on Evidence,* § 2071, at 515 n. 3 (Chadbourn rev.1978) (citing *Lucas, supra,* 30 N.J. 37, 152 A.2d

50; *State v. Johnson,* 31 N.J. 489, 158 A.2d 11 (1960)), *quoted in DiFrisco, supra,* 118 N.J. at 273, 571 A.2d 914. Under that standard

> the State ... must produce only "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness." *Lucas, supra,* 30 N.J. at 56[, 152 A.2d 50].... Or, in other words, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."

> [*Mancine, supra,* 124 N.J. at 251, 590 A.2d 1107 (quoting *DiFrisco, supra,* 118 N.J. at 273, 571 A.2d 914 (quoting *Smith v. United States,* 348 U.S. 147, 156, 75 S. Ct. 194, 199, 99 L. Ed. 192, 200–01 (1954))).]

Our corroboration standard requires that the trial court "determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy." *Lucas, supra,* 30 N.J. at 62, 152 A.2d 50. The corroboration requirement has both legal and factual components. As a matter of law, the trial court initially must determine whether the State has presented independent corroborative evidence of the trustworthiness of the confession. If the State presents "some" corroboration, *DiFrisco, supra,* 118 N.J. at 271, 571 A.2d 914, the confession is submitted to the fact finder to "resolve arguments and speculation about its weight and sufficiency." *Id.* at 272, 571 A.2d 914 (internal quotation marks omitted).

As noted by the Appellate Division, the State met its burden, producing more than sufficient evidence to corroborate the substance of defendant's confession for purposes of sending the question of its reliability to the jury for determination. The State's witnesses testified about where Suhan's body was discovered and the injuries she suffered, which information corresponded to defendant's statements about his presence at the body's location and what he observed, specifically his reference to the "red thing" nearby the pile he saw there, and his description of the manner in which he attacked Suhan. Furthermore, multiple witnesses testified

about defendant's expressed desire to go to the roller rink on the night of the crime, and one observed injuries to defendant's right hand the day after the murder occurred. We conclude that the State presented the corroboration required under *Lucas* and *DiFrisco,* and that the trial court properly let the jury resolve how much weight the confession should be given.

*Cook*, 847 A.2d 530, 548–49.

At the outset, it does not appear that Mr. Cook's argument presents a constitutional claim. It is not a rule of federal law, but rather of New Jersey criminal law, that he invokes in support of the contention that "an uncorroborated extrajudicial confession cannot provide the evidential basis to sustain a conviction." *State v. Lucas*, 30 N.J. 37, 51, 152 A.2d 50 (1959). This is a version of the old *corpus delicti* principle. At least one court in this District, citing appropriate case law, notes that "[c]ase law suggests . . . that this rule is not constitutionally based, and therefore a 'violation' of the uncorroborated confession rule may not amount to a violation cognizable on habeas review.'" *Reddick v. Warren*, No. 12-7875, 2016 WL 29261, at *12 (D.N.J. Jan. 4, 2016) (citing *Bennett v. Ricci*, No. 06-3583, 2007 WL 2444118, at *17 (D.N.J. Aug. 22, 2007)); *see also Johnson v. Williams*, No. 14-4196, 2015 WL 2452828, at *6 (N.D. Ill. May 20, 2015) (finding claim that confession was not corroborated was not cognizable in 2254 action because "Illinois' *corpus delicti* rule is not required by the United States Constitution.") (citation omitted); *Lindsey v. Keith*, No. 13-2912, 2014 WL 5448945, at *11 (W.D. La. Oct. 21, 2014) ("[S]tate rule of *corpus delecti* 'has no independent constitutional footing' and is not controlling on collateral review before this Court.") (quoting *Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983)); *Carter v. Poole*, No. 04-1386, 2008 WL 2949385, at *18 (N.D.N.Y. July 30, 2008) (claim that confession was not corroborated as required by state law not cognizable on federal habeas review because it is a "a state law requirement that embodies no federal constitutional principle.") (internal quotation marks and citations omitted).

Even assuming that there is some constitutional dimension to the corroboration rule, Mr. Cook failed to show that the state court's denial of this claim was based on an unreasonable determination of the facts. The state court declined to accept the premise of Mr. Cook's argument; it found that there had indeed been corroboration, and that finding was not unreasonable in light of the record. For example, Mr. Cook's confession included the location of Katrina Suhan's body. His description of how he killed her was consistent with her injuries. The injuries to his own hand and knuckles were likewise consistent with the confession and the circumstances of the murder.

Within Claim III, Mr. Cook also asserts that the conviction, setting aside his confession, was against the weight of the evidence. I have already ruled that the confession would not be set aside. In any event, however, the New Jersey Supreme Court permissibly rejected that claim in the following terms:

> Moreover, it was for the jury to evaluate the strength of that evidence, weighed against the State's failure to demonstrate definitively how defendant got to South Amboy. And, although sketchy, there was evidence that defendant could drive (notwithstanding his lack of a driver's license), and that there was adequate time for him to have gotten from Somerville to South Amboy. Thus, although defendant never argued at trial that the jury's conviction was against the weight of the evidence, not having moved for a new trial on this ground in a timely manner, see *Rule* 2:10–1, defendant has not proven that the guilty verdict was a manifest denial of justice. We reject defendant's separate argument that the verdict was against the weight of the evidence.

*Cook*, 847 A.2d at 549.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). A petitioner raising an insufficiency of the evidence claim faces a "'very heavy burden' to overturn the jury's verdict for insufficiency of the evidence." *United States v. Root,* 585 F.3d 145, 157 (3d Cir. 2009) (citing *United States v. Dent,* 149 F.3d 180, 187 (3d Cir.1998)). In analyzing a sufficiency of the evidence claim, a court examines both the direct and circumstantial evidence in their totality. *See United States v. Pavulak,* 700 F.3d 651, 668 (3d Cir. 2012) (citations omitted).

Considering the confession, as well other evidence produced at trial, and viewing it in the light most favorable to the prosecution, I am unable to conclude that the New Jersey Supreme Court's denial of this claim was an unreasonable application of clearly established federal law or that it rested on an unreasonable determination of the facts. *See, e.g., Yates v. Rivera*, No. 03-1057, 2007 WL 2027284, at *5-7 (N.D.N.Y. July 9, 2007) ("Based upon the evidence adduced at trial, including petitioner's own confession and the medical evidence revealing [victim's injuries], ... petitioner has not demonstrated that [Appellate Division's] decision rejecting [petitioner's] insufficiency claim is either contrary to, or represents an unreasonable application of, *Jackson* and its progeny").

Mr. Cook is not entitled to federal habeas relief on either of his arguments within Claim III.

D. Claim IV – Exclusion of "reverse 404(b)" evidence of Noga murder

In Claim IV, Mr. Cook asserts that an evidentiary ruling of the trial court violated his right to due process by impairing his presentation of a complete defense. Specifically, he faults the trial court's exclusion of evidence of another murder which, he says, tended to suggest that that unknown murderer, and not Mr. Cook, murdered Katrina Suhan.

The last reasoned decision on this claim was on direct appeal to the New Jersey Supreme Court, which analyzed the claim as follows:

> Defendant also argues that he was denied a fair trial because he was prevented from making a presentation to the jury concerning evidence of a similar murder, committed while defendant was incarcerated, that would have presented the prospect of third-party guilt. A defendant is entitled to introduce evidence that another person committed the crime or crimes of which the defendant is charged. *State v. Jimenez,* 175 N.J. 475, 486, 815 A.2d 976 (2003). Often a defendant attempts to place responsibility for the crime on a specific third party. See *State v. Koedatich,* 112 N.J. 225, 297–312, 548 A.2d 939 (1988), *cert. denied,* 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989). A corollary is the situation presented here in which a defendant seeks to introduce similar "other-crimes evidence defensively." *State v. Garfole,* 76 N.J. 445, 453, 388 A.2d 587 (1978) (*Garfole I*). The standard for introducing defensive other-crimes evidence is lower than the standard imposed on "the State when such evidence is used incriminatorily [because] when the defendant is offering that proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility." *Id.* at 452–53, 388 A.2d 587.
>
> Even if defensive other-crimes evidence passes the "simple" relevancy test, however, a court must still consider whether " 'its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of ... confusing the issues or of misleading the jury.' " *Id.* at 455–56, 388 A.2d 587 (quoting former Evid. R. 4). Thus, a trial court must analyze the proffered defensive other-crimes evidence pursuant to N.J.R.E. 403. In *Garfole I,* we characterized the trial court's determination on the admissibility of defensive other-crimes evidence as "highly discretionary," depending as it does on the weighing and balancing of the various *Rule* 403 factors. *Id.* at 457, 388 A.2d 587. *Accord State v. Bull,* 268 N.J. Super. 504, 511–13, 634 A.2d 101 (App.Div.1993) (holding that, under "highly discretionary" standard, trial court's refusal to admit portion of defensive "other crimes" evidence at most was harmless error).
>
> *Garfole I* is instructive. In that case the defendant was charged in relation to five incidents involving the molestation of minors. The State dismissed the charges against the defendant concerning all but one of the episodes, and the defendant was convicted on all

charges arising from that remaining episode. The defendant attempted to offer evidence of the four episodes for which all charges against him were dismissed, hoping to establish that the similarity of the conduct in each of the five episodes led to the conclusion "that one person was responsible for all of them and that defendant was not that person because he had an alibi for all but two of the occasions involved." *Id.* at 448, 388 A.2d 587. The trial court rejected the defendant's proffer, and we remanded for a determination concerning whether the proffered evidence satisfied our modified relevancy analysis. *Id.* at 457, 388 A.2d 587. On remand, the trial court found that the probative value of the defendant's proffer was substantially outweighed by the likelihood that the jury would be confused and misled because defendant's evidence "would result in a series of 'mini-trials' as to defendant's guilt on charges for which he was not being tried." *State v. Garfole*, 80 N.J. 350, 352, 403 A.2d 888 (1979) (*Garfole II*). We agreed with the trial court's conclusions and affirmed. *Ibid.*

In this matter, during a pre-trial Rule 104 hearing, defendant sought to present evidence of the murder of Nancy Noga, a young, Caucasian female, about the same age as Katrina Suhan who, like Katrina, had brown eyes and long brown hair. Noga's body was found in January 1999, in an area approximately one mile from where Suhan's body was found. Both victims encountered their assailants while walking home at night. Noga's death also was caused by a blunt trauma to her head. Because the Noga investigation was ongoing, the Court's review included *in camera* review of certain information.

Similar to *Garfole I*, defendant sought to establish that an unknown third person committed both murders, which if true, would raise a reasonable doubt concerning defendant's guilt because he was incarcerated at the time of Noga's murder. The trial court found that the Noga murder met the "simple relevance" requirements of *Garfole I* for introducing defensive other-crimes evidence because of the "superficial" similarity of the victims, who were close in age and body-type. However, the trial court also determined that the probative value of the proffered evidence was minimal. Specifically, although Katrina's assailant had a sexual motive, there was no evidence of any sexual motive in the Noga killing. Also, Suhan appears to have been abducted by her assailant in a vehicle and taken to the area where her body was found. In contrast, there was no evidence that Noga was abducted—Noga's body was found near where she was last seen. The trial court found "nothing distinctive to tie the two [crimes] together in any manner to indicate that they were the work of the same person." Finally,

the trial court observed that it would have to hold a "mini-trial" of
sorts on serial killers and homicidal pathology to link the two
crimes, an exercise that the court determined would have
"tremendous potential for confusing and misleading the jury." On
balance, the court determined that those countervailing factors
substantially outweighed the minimal probative value of the
proffer and excluded the evidence.

We accord substantial deference to the trial court's "highly
discretionary determination." *Garfole* I, *supra,* 76 N.J. at 457, 388
A.2d 587; *see generally State v. Morton,* 155 N.J. 383, 454, 715
A.2d 228 (1998) (citing *Koedatich, supra,* 112 N.J. at 313, 548
A.2d 939 (affirming trial court's *N.J.R.E.* 403 ruling that "was not
a clear error of judgment and did not result in manifest denial of
justice")). The Appellate Division aptly described the trial court's
analysis as "comprehensive and thoughtful." *Cook, supra,* slip op.
at 16. As in *Garfole,* on review of a full record and the application
of the correct test for admissibility, we find no clear error of
judgment or manifest denial of justice. We affirm the trial court's
denial of defendant's asserted evidence of third-party guilt.

*Cook,* 847 A.2d at 549–51.

This claim is not cognizable on federal habeas review to the extent it is premised on a

violation of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) (stating that "it is not

the province of a federal habeas court to re-examine state-court determinations of state-law

questions"). It may be considered, however, under the due process clause. The test of a due

process violation is not merely whether there has been an error, but whether the state court's

ruling was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano*

*v. Oklahoma,* 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir.

2001) (noting that to show that an evidentiary error rises to the level of a due process violation, a

petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of

the entire trial"). The United States Supreme Court has "defined the category of infractions that

violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352

(1990). While "the Constitution guarantees criminal defendants a meaningful opportunity to

present a complete defense," *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 475 U.S. 683, 690 (1986)), the Constitution prohibits only "the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote[.]" *Holmes*, 547 U.S. at 326. The Constitution permits judges to "exclude evidence that is repetitive ..., only marginally relevant or poses an undue risk of harassment, prejudice [or] confusion of the issues." *Crane*, 476 U.S. at 689-690; *see also Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence").

Mr. Cook has failed to show that the New Jersey Supreme Court's denial of this claim was an unreasonable application of clearly established federal law, or that it resulted in a decision based on an unreasonable determination of the facts. This evidence, sometimes referred to as "reverse 404(b)," would require the jury to accept, simply because of the nature of the two crimes, that one person committed both. As described above, this evidence was excluded under the State version of the Rule 403 balancing test because there was no sexual motive or evidence of abduction in the other killing. This was therefore very far from a unique *modus operandi* or "signature crime" that implied a single perpetrator. Furthermore, the PCR judge determined that it would require a mini-trial within a trial to draw some psychological or other attenuated connection between the two. Such a mini-trial would be confusing to the jury and would not be justified by its probativeness. Such a weighing of the probative value of this evidence was within the trial court's proper discretion. It was not an unreasonable application of United States Supreme Court precedent.

Accordingly, Mr. Cook is not entitled to relief on Claim IV.

E.  Claim V – Failure to present alibi defense

In Claim V, Mr. Cook claims that his trial counsel was ineffective because he failed to pursue an alibi defense. The last reasoned decision on this claim came from the New Jersey Superior Court, Appellate Division, on review of the denial of the PCR petition. That court stated as follows:

> We begin our analysis of Cook's arguments with the presumption that he received the assistance of counsel that is mandated by the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution. *Strickland v. Washington,* 466 U.S. 668, 689, 694, 104 S. Ct. 2052, 2065, 2068, 80 L. Ed. 2d 674, 694, 698 (1984); *see also State v. Loftin,* 191 N.J. 172, 198–99 (2007).
>
> We review claims of ineffective assistance of counsel under the two-factor test established by the United States Supreme Court in *Strickland* and subsequently adopted by our Supreme Court in *State v. Fritz,* 105 N.J. 42, 58 (1987) (implementing the *Strickland* standard for ineffective assistance of counsel claims under Article I, Paragraph 10 of New Jersey Constitution). *See State v. McDonald,* 211 N.J. 4, 29–30 (2012). First, Cook must demonstrate that counsel's performance was deficient. *Strickland, supra,* 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. Second, he must show there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. With respect to both factors of the *Strickland* test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his right to relief by a preponderance of the evidence. *See State v. Echols,* 199 N.J. 344, 357 (2009).
>
> Also,
>
>> [t]he right to counsel guarantees defendants the right "to competent counsel." *State v. DiFrisco,* 174 N.J. 195, 220 (2002). Attorneys are held to a standard of "reasonableness under prevailing professional norms." *Strickland, supra,* 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. Deficient performance is established by proving that "counsel's acts or omissions fell 'outside the wide range of professionally competent assis

tance' considered in light of all the circumstances of the case." *State v. Castagna,* 187 N.J. 293, 314 (2006) (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695). And, the evaluation as to the reasonableness of an attorney's performance must be "'viewed as of the time of counsel's conduct.'" *Ibid.* (quoting *Strickland, supra,* 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 694).

[*State v. Gaitan,* 209 N.J. 339, 350 (2012).]

Cook contends that defense counsel was ineffective because he failed to effectively pursue an alibi-type defense. Instead, because there was no forensic evidence linking Cook to the murder, the case ultimately came down to Cook's confession and other circumstantial evidence tying him to the crime. During cross-examination of the State's witnesses, defense counsel was able to demonstrate that almost no documentation had been prepared by police and very little physical evidence had been collected. This was further buttressed during summation where defense counsel stated that the police never took fingerprints from Suhan's body or exemplars from the people Suhan had interacted with the evening prior to her death. Defense counsel exhorted the jury to acquit by arguing that the State had not proven its case because no one could show how Cook had managed to get to South Amboy, the location of the crime.

Notwithstanding these efforts, Cook suggests that the defense should have proffered the live testimony of persons who were with Cook on the night in question in order to bolster the theory that he could not have been present when Suhan was murdered. The PCR judge noted that "in order to establish an alibi, one must say, well something happened at a particular time and at that particular time [Cook] was someplace else." Because the actual time of death could not be ascertained, defense counsel was unable to credibly mount a conventional alibi defense. Further, the PCR judge concluded that the jury charge regarding Cook's general denial of guilt—because Cook contended he was not present at the time and place where the murder was committed—was appropriate given the inability to determine the time of death. Therefore, according to the PCR judge, defense counsel's attempt to establish reasonable doubt by demonstrating the putative impossibility of defendant traveling to South Amboy was a strategic decision made at the time of the trial and did not "rise to a level sufficient to grant a new trial."

> Our standard of review is plenary on questions of law in a PCR appeal, but the factual findings of the PCR court are granted deference if they are supported by adequate, substantial, and credible evidence. *State v. Harris,* 181 *N.J.* 391, 415 (2004), *cert. denied,* 545 *U.S.* 1145, 125 *S.Ct.* 2973, 162 *L. Ed.*2d 898 (2005). We agree with the PCR court's conclusion that Cook's better-alibi-defense theory did not satisfy either part of the *Strickland* test for ineffective assistance of counsel. Although another attorney presenting a defense at trial might have chosen to offer additional evidence of the implausibility of the State's timeline, we cannot discern that defense counsel was ineffective in the way he handled the difficult temporal issues, particularly in light of Cook's confession, which filled in many of the State's gaps.

(Dkt. No. 29-3 at p.7-11)

The Appellate Division correctly stated and applied the rule of *Strickland v. Washington,* 466 U.S. 668 (1984). There, the Supreme Court articulated a two-part test for evaluating a claim of ineffective assistance of counsel.

First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688; *see also Ross v. Varano,* 712 F.3d 784, 798 (3d Cir. 2013). To do so, the petitioner must identify particular acts or omissions that were not the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. The federal court must determine whether, in light of all of the circumstances, the identified acts or omissions fell outside the wide range of professional competent assistance. *See id.*

Second, the petitioner must affirmatively demonstrate prejudice. "Prejudice" means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697).

Finally, on habeas review, it is ordinarily not enough that a federal judge, if presented with the issue as an original matter, would have found counsel ineffective. AEDPA deference requires that the judge find that the state court's resolution of the ineffective-assistance claim was unreasonable, a higher standard:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland* 's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 562 U.S. at 101 (internal quotation marks and citation omitted; emphasis in original).

The state court reasonably applied the *Strickland* standard to the facts of Mr. Cook's case. For example, the state court noted that the precise time of death could not be ascertained. Thus, any alibi defense would have to be airtight, in the sense of covering the entire time frame during which the murder could have occurred, a difficult challenge. Instead, counsel chose to emphasize

reasonable doubt and the uncertainty surrounding Mr. Cook's ability to travel to South Amboy at all. For the court to defer to that strategic decision was not an unreasonable application of, and indeed was required by, *Strickland. See* 466 U.S. 681 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."); *Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir. 1998) ("Our review of ineffective assistance of counsel claims does not permit us, with the benefit of hindsight, to engage in speculation about how the case might best have been tried. We therefore accord counsel's strategic trial decisions great deference."). The state court's reasoning does not amount to an unreasonable application of the *Strickland* standard.

F.  Mr. Cook is not entitled to federal habeas relief on Claim V.Claim VI – Failure to present third-party guilt evidence re: "KH." assault

In Claim VI, Mr. Cook claims that trial counsel was ineffective for failing to present relevant testimony which affirmatively supported a third-party guilt defense. (This claim is distinct from the "reverse 404(b)" argument in Claim IV.) Here, Mr. Cook argues as follows:

> Prior to trial, the State filed a motion seeking to take photographs of the Defendant on the basis he might have been involved in a previous sexual assault which factually resembled the circumstances regarding the victim's death. Although the motion was granted, the photographs subsequently taken did not depict the same physical characteristics the perpetrator possessed as described by the victim. Trial counsel had been remiss by failing to present relevant testimony arising therefrom which would have affirmatively supported a third party guilt defense . . . .
>
> [T]he relevant information supporting this contention came from the affidavit of Det. Moscaritola, which had been prepared in support of the motion. According to the affidavit, in February, 1997, the detective investigated an aggravated sexual assault which occurred in Old Bridge Township, in which a young petite white female was sexually assaulted after having been picked up by a

black male while walking in Sayerville. The assailant agreed to drive the victim to her intended destination yet, on the way there, pulled into an empty parking lot and told her she was pretty. The assailant exited the car to urinate and returned to the car with his pants undone. He then spoke with the victim about his penis, and began kissing and fondling her, telling her he intended to give her a belated Valentine's Day present. He tried to force her to perform oral sex and, when she resisted, he became forceful and ultimately had vaginal intercourse with her. Since she had previously been assaulted, and fearing for her life, the victim offered minimal resistance.

When the Defendant became aware she was menstruating, he became angry. The victim (K.H.) provided a detailed description of the assailant which included a visible skin discoloration on one of his thighs. According to the victim, the assailant called himself "T-Ray or Turae". The victim subsequently learned her assailant frequented a South River boarding home. The victim further learned that "Turae" was also known as "T".

According to the detective, Defendant's statement to police following his arrest on February 19, 1998 provided numerous details similar in nature to the sexual assault. Specifically, the Defendant initially encountered the victim while she was walking and he offered her a ride. He told her she was pretty and that he wanted to be with her and, when the victim resisted, the Defendant became violent and struck her. The Defendant was upset he had not been able to spend Valentine's Day with his girlfriend, and that a previous relationship had ended on Valentine's Day in 1997.

In addition, Defendant was known to like and befriend young white girls, and was commonly known as "Tee". Further, the victim had been menstruating at the time she was killed and, although not sexually abused, had been found with her jeans and panties pulled down. The Defendant "closely" resembled the suspect, while his physical description was consistent with that of the assailant in the sexual assault as well. Finally, the sexual assault occurred within one mile of the scene of the homicide.

The trial court granted the State's motion and, as a result, photographs of the Defendant were taken by the police in May 1998. However, those photographs revealed no unique discoloration on the Defendant's thigh.

(Dkt. No. 17-1 at p.23-25)

During PCR proceedings, Mr. Cook argued that trial counsel should have pursued the theory that Cook lacked the thigh discoloration  and therefore did not commit the unsolved 1997 sexual assault of "K.H."; that similarities between the two cases imply that the unknown 1997 assailant also killed Katrina Suhan; and that therefore Mr. Cook did not kill Katrina Suhan. The Appellate Division denied this claim without discussion.

The last reasoned decision on this claim came from the Superior Court during Mr. Cook's PCR proceedings. The PCR judge analyzed the claim in an oral opinion from the bench as follows:

> The next point, I believe, that we have was that Counsel was ineffective for failing to introduce evidence of an unsolved sexual assault, which occurred prior to the murder of Katrina Suhan as evidence of a third person.

> Again – and again, the same thing. The – the – the defense was, we didn't do it, we weren't there, we don't know what happened, and therefore to – and we had already established that there was been no sexual contact between the defendant and the victim. Thereby there was no need to even address this alleged sexual assault. Again reasoned well and – and acted upon in appropriate fashion. Again, in this Court's opinion, doesn't rise to a level of ineffective assistance under the circumstances.

(Dkt. No. 31-7 at p.22-23)

"Under the 'unreasonable application' clause [of § 2254(d)(1)] a federal habeas court may grant the writ if the state court identifies the correct legal principle from . . . [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413. The State court's analysis was terse.[3] The PCR judge identified only one point of dissimilarity between the two crimes: the sexual component of the

---

[3] It is likely that the state judge, in saying "again, the same thing," was incorporating his reasoning as to the parallel "reverse 404(b)" contention now contained in Claim IV.

1997 K.H. assault, and the lack of any sexual assault in connection with Katrina Suhan's murder. (That asserted distinction is problematic, as stated below.)

The New Jersey Supreme Court has held that similar offense evidence, when introduced exculpatorily by a defendant, need not meet the same high standard required of the prosecution when it seeks to introduce such evidence inculpatorily. *See State v. Garfole*, 368 A.2d 587, 591 (N.J. 1978). "[S]imple relevance to guilt or innocence should suffice as the standard of admissibility." *See id.* True, there is no federal habeas relief based on an error of state evidentiary law as such. But constitutionally effective counsel, defendant implies, would have recognized that advantageous state evidentiary standard and taken advantage of it.

Mere disagreement with the state court's finding on this ineffective assistance of counsel claim is insufficient to warrant granting habeas relief. *See Williams*, 529 U.S. at 411 ("A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."). But where the state court's decision was based on an unreasonable determination of the facts, it loses the benefit of the deferential AEDPA standard and a district court will review it *de novo. See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003); *Boyd v. Waymart*, 579 F.3d 330, 336 n.7 (3d Cir. 2009) (Scirica, J., concurring) (where petitioner able to show that state court factual determination was unreasonable under § 2254(d)(2), district court applies *de novo* review to ineffective assistance of counsel claim).

The PCR court may not have been sufficiently sensitive to the relatively low threshold for admissibility. I note also the New Jersey Supreme Court's statement on direct appeal that there was a sexual motive, if not a completed sexual assault, in the Katrina Suhan case. *See Cook*, 547

A.2d at 569. I, too, am satisfied that the Suhan facts contain a strong sexual component. I am

thus sufficiently concerned with the PCR court's application of *Strickland* that I will not defer,

but grant *de novo* review of this claim.

Applying *de novo* review, I nevertheless find that Mr. Cook would not be entitled to

habeas relief on this claim, because he fails to satisfy the "prejudice" prong of *Strickland*. He has

failed to demonstrate a reasonable probability that, absent the claimed error, the outcome of the

case would have been different.

The persuasiveness of the 1997 sexual assault evidence depends on two inferences. First,

the jury would have to conclude that the "K.H." assailant was someone other than Mr. Cook.

That first inference is supportable, if not compelling; it is based on the statement of "K.H." that

her assailant had a discoloration on his thigh, coupled with the photographic evidence that Mr.

Cook did not. Second, the jury would have to conclude that the K.H. assault and the Suhan

murder were committed by the same person. That second inference is highly debatable. It is not

based on any identification of the K.H. assailant, but only on some fairly generic similarities

between the two crimes. For example, the crimes happened within a year of each other, in

neighboring geographic areas (though not at any of the same sites). The victim was a young

female, vulnerable because she was walking alone. Both were picked up by an assailant who was

in a car. Such commonalities could be found among many sexual assault cases. And there is of

course one great dissimilarity in the *modus operandi*: the K.H. case involved a sexual assault,

while Ms. Suhan was brutally beaten to death.

That indirect evidence, if admitted, would have had to overcome persuasive direct

evidence of guilt. Mr. Cook confessed. His confession was corroborated by the actual facts of the

assault and murder. T.S. testified that Mr. Cook knew a woman named Katrina and said he

intended to go to the skating rink the next day to "scare" someone, whom T.S. took to mean

Katrina. (See Dkt. No. 30-5 at p.19-20) Pascale testified that Mr. Cook was excited to go to the

roller rink on the night of the murder. (See Dkt. No. 30-2 at p.55-56) Pascale also testified that,

when she saw Mr. Cook afterward, he had a swollen knuckle and small cuts around the

knuckle—injuries consistent with the manner in which Ms. Suhan was killed. (*See id.* at p.57)

It is not at all probable that the outcome of the trial would have been different if counsel

had sought to introduce evidence of the unsolved 1997 sexual assault case. The "prejudice"

requirement, one of two under *Strickland*, is not satisfied.

Even applying *de novo* review, then, I find that Mr. Cook is not entitled to federal habeas

relief on Claim VI.

### G. Claim VII – Failure to object to Heather Stonbely's testimony

In Claim VII, Mr. Cook asserts that counsel was ineffective when he failed to object to

late disclosure of the testimony of Heather Stonbely, or to the testimony itself. At a minimum,

Mr. Cook argues, counsel should have requested a continuance or introduced contradictory

evidence.

The Appellate Division denied this claim without discussion. The last reasoned decision

on this claim was from the Superior Court during Mr. Cook's PCR proceedings. The PCR Court

laid out the relevant standard for analyzing Mr. Cook's ineffective assistance of counsel claims:

> I first need to address what the law is that I'm going to be
> following and it's well established what that law is that I should be
> following. And that is in making a determination as to whether or
> not, based upon the claim, that there has been ineffective assistance
> of counsel as it concerns the defendant's trial. Whether or not that
> ineffectiveness rises to a level sufficient to, again, require either a
> preliminary hearing or – evidentiary hearing, or an out and out new
> trial based on the evidence that has been presented to the Court.

What the first thing is that the defendant has to show in an ineffective assistance of counsel claim on a P.C.R. is a prima facie case that there must be a reason for likelihood of succeeding on the merits and that in addition to that, he may have been prejudiced as a result of the errors committed by the trail cancel [sic]– Counsel below.

Now there's an – I Guess a – there's a two prong task that must also be established pursuant to *Strickland* (phonetic) and *Fritz* (phonetic) that in order to establish ineffective assistance of counsel the defendant – burden is on the defendant to show two things, not one of two, but two things.

One he must show that his Counsel at the time – that Counsel's performance fell below the – and I'm summarizing – fell below an objective standard of reasonableness. And then he must also show that based on the errors committed by Counsel, that those errors were so egregious that had he not committed those errors, at that time. That the result of his case would have been different.

(Dkt. No. 31-7 at p.3-5) Allowing for the fact that this was an informal oral opinion, that statement demonstrates that the PCR judge had the twofold *Strickland* standard firmly in mind when he ruled.

The PCR judge then analyzed this ineffective assistance of counsel claim as follows:

Next is an allegation that Counsel was ineffective because he failed to object to late discovery concerning the testimony of Heather Stonbely (phonetic) or any alternative. For failing to seek a continuance of the trial to investigate this evidence or any alternative. For failing to present evidence that contradicted her testimony.

The testimony of Mister – Ms. Stonbely – Stonbely was, primarily that which is alleged by the P.C.R. attorney. It connects Mr. Cook to having some acquaintance, however slight it might have been, with the victim. And apparently based upon Ms. Stonbely's testimony, Mr. Cook had seen the victim in the skating rink prior to her death. That there was a short conversation between the parties as it concerns, I believe, a picture or – or – or of some sort that Miss – that the victim had drawn and allegedly Mr. Cook commented on, because of his artistic interest. And that there was some smiling exchanged and primarily, it didn't appear that there

36

was much more than that, that connected Mr. Cook with the victim.

And as it concerns the allegation that – the fact that this – this testimony of this witness was late and therefore the defendant attorney should have asked for a – an adjournment or a – or object to it, again, I believe he did object. However, there was not much he could do in light of the fact that the Court overruled the objection.

Again, to ask – to say that he was ineffective because he didn't ask for a continuance, again, that's a bit of a stretch because that wasn't even up to him anyway. He could only ask for it and if the Court did not give it to him there was nothing else he could do – again, based upon my reading of the transcript, I find that he did in fact object to that discover [sic]. And ask the Court, or you know he mad [sic] as much of an objection that he possibly could at t[h]e time ... [gap where tape changed][4]
– level of – ineffectiveness, taken in – in conjunction with everything else is not, in my opinion, sufficient to establish ineffective assistance of counsel.

(Dkt. No. 31-7 at p.32-34)

In denying this claim, the PCR court relied on the fact that Mr. Cook's trial counsel, Mr. Anderl, objected. The transcript does not reveal, however, that Mr. Anderl objected to Stonbely's testimony or that he sought and was denied a continuance specifically on the basis of late discovery. Indeed, Anderl acknowledged receiving the discovery but brushed it aside as "innocuous."[5]

I refer to the following colloquy among the trial court, Mr. Anderl and Mr. Kapsak (the prosecuting attorney):

---

[4] The transcript of the PCR court's ruling from the bench is cut off at this point in the transcript because the first tape ended and a second tape was then started.

[5] Mr. Anderl may have raised a similar issue with respect to another witness, John Buonacore, before trial, but that is irrelevant to whether he raised the issue as to Stonbely. (*See* Dkt. No. 29-10 at p.7.) The portion of the January 26, 2000 trial transcript that was provided by respondents on ECF is out of order as p.9-12 come before p.6-8. For reference, however, this Court will use the page numbers with respect to this transcript as they appear on the docket in Dkt. No. 29-10.

> MR. KAPSAK:  There was actually a witness after that who came forward just a few days ago and as soon as I heard about the witness, before I even talked to her, I called Mr. Anderl and then as soon as I talked to her. I prepared a report, a letter indicating what she said and I faxed that over to him.
>
> THE COURT:  Did you get it?
>
> MR. ANDERL:  Yes, Judge.
>
> THE COURT:  What's her name?
>
> MR. ANDERL:  It's innocuous.
>
> MR. KAPSAK:  Her name is Heather Stonbely. So yes, discovery is complete.
>
> THE COURT:  All right[.]

(Dkt. No. 29-10 at p.16)

That the PCR court recalled that Mr. Anderl made an appropriate objection to this witness, which was denied, was an apparent memory slip. Out of caution, I will therefore assume that the PCR court made a decision based on an unreasonable determination of the facts. As discussed above, under such circumstances, I will set aside AEDPA deference and review the matter *de novo*.

I opt to consider the second, prejudice prong of *Strickland*. Mr. Cook has not shown to a reasonable probability that the outcome of the proceeding would have been different if Mr. Anderl had objected to late discovery and tried to prevent Stonbely from testifying.

First, it is unlikely that any such objection would have resulted in the exclusion of Stonbely's evidence. The prosecutor stated, and Mr. Cook does not deny, that the witness came forward on the eve of trial, and that he promptly notified Mr. Anderl. The New Jersey Rules of Court provide that there is a continuing duty to provide discovery to the other party. *See* N.J. Ct. R. 3:13-3(f). If a party fails to comply with this rule, it may order the party to permit discovery of the materials not previously disclosed, grant a continuance or a delay during trial, or prohibit a party from introducing evidence in the material not disclosed. *See id.* No violation of the

"ongoing duty" under the discovery rules appears from this record. This is not a situation—*e.g.,* a prosecutor's deliberate delay in disclosing evidence—that would compel a trial judge to exclude relevant testimony, as opposed to imposing lesser measures to avoid unfair surprise. Mr. Cook fails to show a reasonable probability that, if Mr. Anderl had objected to Stonbely's testimony, it would have been excluded.

Second, it is unlikely that exclusion of Stonbely's testimony would have altered the outcome; while relevant, it was hardly critical. Stonbely was friendly with Katrina Suhan, and she frequented the skating rink. On one occasion, Stonbely and Katrina Suhan were doing tricks at the rink when they noticed Mr. Cook. (*See* Dkt. No. 30-6 at p.4) On another occasion, Mr. Cook commented to Katrina Suhan that he liked a picture that she had just drawn. (*See id.*) On a third occasion, Stonbely testified, Katrina Suhan fell while skating, and Mr. Cook stared at her. (*See id.* at p.5) Stonbely also testified that Mr. Cook once pinched Katrina Suhan's arm. (*See id.* at p.5)

Stonbely thus testified to a few fairly innocuous interactions between the victim and Mr. Cook. These established at most that he had seen her at the rink and was generally familiar with her. Other evidence at trial, however—including Mr. Cook's confession—powerfully and directly implicated Mr. Cook as the perpetrator and established his connection to her. (*See* Section F, *supra.*)

Accordingly, Mr. Cook fails to show that he was prejudiced by Mr. Anderl's failure to object to Stonbely's testimony.

Mr. Cook makes the related arguments that Mr. Anderl was ineffective because he should have sought a continuance or introduced evidence to contradict Stonbely's testimony. He says nothing specific about what a continuance would have accomplished; he may be referring to the

opportunity to marshal the testimony of two uncalled witnesses, Oscar Romera and John DiAngelantonio. According to Mr. Cook, Romera would have testified that he skated at the rink on Friday nights during the fall and winter of 1997, yet did not recall seeing Mr. Cook there. Romera also indicated, however, that he sometimes did not go to the rink. Mr. Cook claims that the roller rink's manager, John DiAngelantonio, would have testified that, although Mr. Cook was a "rink rat" and a Friday/Saturday regular, he had not seen Cook for approximately six to ten months prior to the night of the murder. This testimony would have been at best a mixed benefit to Mr. Cook's defense; at a minimum, it generally places him at the rink where the victim regularly skated. Stonbely, who was friendly with and focused on Katrina Suhan, testified to her specific observations. These witnesses, by contrast, would have testified generally that they failed to note Mr. Cook's presence, a circumstance fairly easily explained away.

Even assuming that these two witnesses would have testified as represented, Mr. Cook fails to show to a reasonable probability that the outcome of the proceedings would have been different had counsel called them. As previously indicated, Mr. Cook's connection to Katrina Suhan was established through his own corroborated confession to the murder, as well as corroborating evidence. *See* Section F, *supra.* And an attorney could justifiably have concluded that the decision to put on a case—if it consisted of nothing stronger than this—might well have backfired by detracting from a reasonable doubt defense.

Accordingly, relief is denied on Claim VII.

H.  Claim VIII – Failure to request confession corroboration jury charge

In Claim VIII, Mr. Cook claims that trial counsel was ineffective for failing to request that the trial court charge the jury with respect to the need to corroborate his confession. The

Appellate Division denied this claim without discussion. The last reasoned decision on this

Claim was from the PCR judge on the New Jersey Superior Court, who decided it as follows:

> And again, the 800 pound gorilla in the room was the confession.
> That confession has been, again alleged that the – there was
> ineffective assistance of counsel, because there was no charge to
> the jury dealing with the need to corroborate the – the confession.
> But counsel, that particular issue had gone up on appeal before this
> P.C.R. was even made, with regard to whether or not the Court had
> established corroboration as it concerns that confession.
>
> And it had been established at that point in time, that the Court's
> assessment of whether or not there had been proper corroboration
> of Mr. Cook confession, was in fact satisfactory to the higher
> Courts. And the confession was not thrown out. It was – it was
> addressed at that point in time. It was affirmed with regard to the
> corroboration of the confession. And to now come back and say
> that that confession as not corroborated by virtue of having a
> charge address it particular is, again in my opinion, insufficient as
> a cause to allege ineffective assistance of counsel.
>
> And I have case law in the form of State v. Roach, which
> essentially indicates that once it is established that the – the – the
> confession is in fact – and has in fact been corroborated that
> inferences – inferences can be drawn that; one, the confession is in
> fact – or has not in fact been coerced and that the jury is left to
> determine, based upon their own, whether or not that confession is
> credible, or – or – or not.
>
> And the facts that there was no charge to that effect, I have not
> found any case law that would establish, that failure to give a
> charge on corroboration is fatal, to the extent that it would require
> an, you know, an establishment of ineffective assistance of counsel
> and therefore a need to grant a retrial.
>
> So, I do not feel, at least as that point has been raised to the Court,
> that it – it rises to a level sufficient to establish a need to grant the
> request for a re-trial.

(Dkt. No. 31-7 at p.24-26)  Mr. Cook fails to show that the state courts unreasonably applied the

*Strickland* standard to this claim or that the denial of this claim was based on an unreasonable

determination of the facts.

As noted by the Superior Court, the New Jersey Supreme Court had already determined on direct appeal that Mr. Cook's confession was adequately corroborated. *See Cook*, 847 A.2d at 564-65. That was not precisely, but was close to, a predetermination that the *Strickland* prejudice requirement was not met. Because the corroboration was clear, I cannot find that giving such an instruction had any likelihood of altering the outcome of trial.

In addition, the PCR Court also found no clear state law entitlement to such an instruction, and Mr. Cook points to none. Thus it was not unreasonable for the PCR court to find that counsel's failure to demand or obtain such an instruction was not ineffective. *See, e.g., Armstrong v. State*, 752 S.E.2d 120, 124 (Ga. Ct. App. 2013) (denying ineffective assistance of counsel claim because there was no prejudice from counsel's failure to request jury instruction on uncorroborated confession, inasmuch as the confession was corroborated); *People v. Ploss*, 483 N.Y.S.2d 449, 451 (N.Y. App. Div. 3d Dep't 1984) (denying ineffective assistance of counsel claim based upon failure to request jury instruction on lack of corroboration of confession where the record contained more than the required amount of corroborative evidence).

Accordingly, Claim VIII will be denied.

I.   Claim IX – Presenting defense through cross-examination was detrimental

In Claim IX, Mr. Cook challenges Mr. Anderl's decision to present a defense through the cross-examination of prosecution witnesses. Aside from criticizing the decision to pursue a general "reasonable doubt" defense, Mr. Cook cites two specific instances of cross-examination that allegedly backfired and harmed his defense.

First, Mr. Anderl cross-examined Pascale about Mr. Cook's knuckle injuries, but did so using a photograph of Mr. Cook that was taken well after the murder took place. When that came

to light, says Mr. Cook, he lost credibility with the jury because Mr. Anderl seemed to have been trying to mislead them.

Second, Mr. Anderl attempted to establish through cross-examination of a detective that Mr. Cook did not drive, and therefore could not have driven from Somerville to South Amboy on the night in question using his girlfriend's car. (*See* Dkt. No. 17-1 at p.39) Mr. Anderl, says Cook, should have known better because he possessed an abstract that documented Mr. Cook's driving history. The objection seems to be that Mr. Anderl opened the door to the detective's testimony that various individuals had observed Mr. Cook driving.

The last reasoned decision was on appeal from denial of the PCR petition in the Appellate Division, which analyzed this claim as follows:

> Cook further argues that he was unfairly prejudiced by his attorney's failure to present a defense beyond cross-examination of the State's witnesses. We disagree.
>
> Defense counsel zealously pursued a reasonable doubt defense at trial. The PCR judge noted that defense counsel "did in fact create doubt" through each witness he cross-examined. Ultimately, however, the final decision was up to the jury to determine if there was reasonable doubt sufficient to find Cook not guilty. Bald assertions are insufficient to support a finding that counsel's conduct was deficient. *See State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div. (finding to obtain relief based on claims of ineffective assistance of counsel a "petitioner must do more than make bald assertions"), *certif. denied*, 162 N.J. (1999).
>
> Cook's confession remained a formidable hurdle to reasonable doubt. As noted by the PCR judge, "[w]hen you have a confession and you don't have anything else the reasonable doubt defense is reasonable, under those circumstances." Thus, mounting this type of defense was a matter of strategy, and we have no occasion to second-guess the reasonableness of such decisions. *See Strickland*, *supra*, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

(Dkt. No. 29-3 at p.12-13)

Mr. Cook fails to show that the state courts' denial of this claim was an unreasonable application of the *Strickland* standard or that the denial resulted from an unreasonable determination of the facts. As noted by the Appellate Division, Mr. Cook's corroborated confession remained a formidable hurdle to overcome. Placing a client who has confessed on the stand may do little more than cement the story in the jury's mind. Mr. Cook's arguments here are insufficient to displace the *Strickland* presumption that an attorney's decisions are strategic.

The specific examples of cross-examination backfiring fall far short of a *Strickland* claim. Even an attorney who plans to put on a positive defense is expected to cross-examine the government's witnesses. Not every cross-examination question goes perfectly or devastates the witness. And these fairly minor mishaps surely did not prejudice the result, a conviction that was supported by, *inter alia,* a complete confession.

In sum, Mr. Cook fails to show that the state court's denial of this claim was an unreasonable application of the *Strickland* standard. Accordingly, Mr. Cook is not entitled to habeas relief on Claim IX.

J. Claim X – Cumulative Error

In Claim X, Mr. Cook asserts that he is entitled to federal habeas relief due to cumulative error. He states that the accumulation of errors or the accumulation of counsel errors violated his right to due process or effective assistance of counsel. With respect to Mr. Cook's claim that counsel's purported cumulative errors warrants relief, he raised this claim during his PCR proceedings. The last reasoned decision on this claim was from the Superior Court during Mr. Cook's PCR proceedings which analyzed this issue as follows:

> [T]he last item is the allegation that all these items cumulatively rise to a level that exhibits ineffective assistance of counsel. . . .

[W]hen you take everything into consideration all the evidence, all the witness's testimony, Mr. Anderal's [sic] cross-examination of these people. His ability to – to establish doubt when it came to the testimony. . . . Because what it always boiled down to again, was the fact that they had a confession from the defendant. And there's no allegation here, before this Court that, that confession was coerced. There was a pre-trial hearing with regard to the confession.

The, of course, confession wasn't taped. I realize that as a result of Mr. Cook's case, and I believe this is one that established that from here on in confessions need to be taped. So that there was no requirement prior to this that there be a taping. The facts that Mr. Cook gave to the officers, based upon their testimony, were facts that allegedly could only be known by the person who committed the offense. And that is what needed to be negated in order for all these other factors to have some type of significance with regard to Mr. Cook being found not guilty.

But as long as that confession was there as long, as there was no argument that the confession was coerced, and I don't – I just don't recall now whether or not that was in fact something that was a running theme during the – during the trial. But even if it was once the confession was let in, once the jury heard about that confession. That was the thing that, I would say, always comes back to you. This gentleman confessed to having committed this offense.

And to say that Mr. Anderal [sic] was ineffective, based upon what he attempted to do in order to convince a jury that Mr. Cook was innocent of the offense. Again, he had a very uphill battle of which very little could be done because there was a confession that the jury heard. Was able to analyze and determine whether or not they felt that confession was credible. And it appears to this Court that, that is what they did. They found that the defendant's confession was credible and as a result he was guilty of the offense charged.

Lastly, this Court feels that another Judge could go through those transcripts, another attorney could go those transcripts and find all kinds of things that they feel should have been done differently. And that's usually the case when you have time to sit down and read a set of transcripts. But again hindsight is 20-20. What happens in the heat of battle is totally different than what can happen when someone has calmness about themselves and time to think through; What would I have done had I been in that situation? And often times that is what occurs in these P.C.R.'s.

There's time to sit down and scrutinize what was done by the attorney to the nth degree.

And even, in my opinion, a different P.C.R. attorney could come up with different factors that they would say the attorney of record was ineffectively. But that's the nature of trial work. It's – it's the situation though, that we can't second guess the guy who was actually there on his feet trying the case. You can try and sometimes you're successful.

But based upon what I have here I see it's a lot of speculation, a lot of opportunity to again make a determination of this is how I would have tried the case if I were in that situation. But again, in my opinion, in my analysis, none of which either alone or cumulatively would have changed the outcome of the case. And why again? The confession. When you have it, it's real hard to convince a jury. Unless you can convince that jury that there was coercion of some sort – or significantly enough that the man was not speaking voluntarily. And none of that was established none of that is being alleged at least to a degree that would rise to a level sufficient to show prima facially that there was ineffective assistance of counsel.

So again looking at Strickland and what is required with regard to the standard of review. I find that the first prong of Strickland requires a showing that the defense counsel's performance was deficient. And next you must show that, that deficiency was so egregious that that the defendant was deprived of a fair trial. And I do not find that was established here, for the reasons I've already espoused.

(Dkt. No. 31-7 at p.36-40)

"[E]rrors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn,* 485 F.3d 103, 139 (3d Cir. 2007); *see also Marshall v. Hendricks,* 307 F.3d 36, 94 (3d Cir. 2002). Cumulative error only warrants habeas relief, however, where a petitioner can show that he was actually prejudiced. *Albrecht,* 485 F.3d at 139. A petitioner seeking to make out a cumulative error claim must therefore show that the errors committed at trial together "had a substantial and injurious effect or influence in determining the jury's verdict." *Fahy v. Horn,*

516 F.3d 169, 205 (3d Cir. 2008). Essentially, Petitioner must demonstrate that the errors in combination would be sufficient to show *Strickland* prejudice. *Albrecht,* 485 F.3d at 139.

Mr. Cook fails to show that he is entitled to federal habeas relief based on cumulative ineffective assistance of counsel. The state court's denial was not an unreasonable application of clearly established federal law nor was the denial based on an unreasonable determination of the facts. The state court's reliance on the fact that Mr. Cook confessed to the murder and therefore could not show prejudice was not an unreasonable application of *Strickland*. And it was a reasonable assessment of the record by a trial judge who had a feel for the trial and the persuasiveness of the evidence.

Within Claim X, Mr. Cook also seeks to include the non-ineffective assistance of counsel claims (Claims I-IV) within his cumulative error claim. To the extent that Mr. Cook seeks to include these four claims within his cumulative error argument, it does not appear that any state court has analyzed all nine of his claims (Claims I-IX) within the cumulative error analysis framework. Thus, such a claim would be considered unexhausted. [6] However "a federal court [may] deny an unexhausted claim on the merits 'if it is perfectly clear that the applicant does not raise even a colorable federal claim.'" *Carpenter v. Vaughn,* 296 F.3d 138, 146 (3d Cir. 2002) (quoting *Lambert v. Blackwell,* 134 F.3d 506, 515–15 (3d Cir. 1997) (construing 28 U.S.C. § 2254(b)(2))); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Adding all nine of Mr. Cook's claims to the cumulative error analysis would not entitle Mr. Cook to federal habeas relief. He fails to show that there was any error with respect to his

---

[6] The ineffective assistance of counsel claims in his PCR proceedings, even if not raised here, were part and parcel of the larger cumulative error claim, and I deem them to be exhausted.

confession (will being overborne, waiving *Miranda* or non-corroboration). And the confession was the devastating heart of the prosecution's case. Furthermore, Mr. Cook fails to show any error with respect to the denial of admission of third-party evidence as described in analyzing Claim IV, *supra* Part IV.D. Thus, even if these additional claims are added to the cumulative error analysis, it would not change this Court's decision that Mr. Cook is not entitled to federal habeas relief on Claim X.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons discussed above, Mr. Cook has not met this standard. This Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the foregoing reasons, the amended habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.


DATED:  November 22, 2016

KEVIN MCNULTY
United States District Judge


48